We will hear the first case on calendar, United States v. Lopez and others. Thank you. Good morning, your honor. Good morning. I'm just, I mean, this is, I'm just thinking that the last time I argued in front of Judge Newman was probably 1985, and it was an interlocutory appeal, UIC every week now. Still here. And we're lucky you're for it, Judge. Thank you. The arguments that are presented in the case with respect to Mr. Lopez are unique in a way, and yet issues that this court and the Supreme Court have been dealing with for the last decade or more. And the real question here is, in an odd sense, many fold. My client's age is one issue, and the mandatory imposition of a mandatory sentence on a young person and the implications of what that youth represents all present the court with an interesting challenge. The science, and I won't bore the court with the science because I know that the court is, I'm sure, up to date with it, but for sure there is a general consensus in the scientific community that youth is something, and adolescence is something that is sort of a moving target. It's not a set of years, but that young people in that category still have problems with impulse control, are vulnerable to peer pressure, are not fully developed in terms of their ability to function. Doesn't that prove too much? Because there are people who are 50 who lack impulse control. That may be for other reasons, Judge. I'm just addressing myself just to youth and the things that we know are reoccurring in young people. These are characteristics that most people, not all, but most people outgrow or learn to cope with. One of the real issues, and I think Your Honor is wise to raise this, one of the real issues then is for a 20-year-old who's 55-year-old gets sentenced to, if it's a mandatory sentence, my client is going to do 70 years in prison or 60 years in prison, and the other individual is going to do 20. My client is barely an accomplice in this case. In the first, in the Polanco murder, he goes along for a ride after he said, no, I'm not going to go. I'm going home to sleep, and then he decides to go along, and then they get out of the car. There's not even agreement as to what's going to happen when they get there. He wasn't involved in any planning. He wasn't even involved in the underlying fracas that gave rise to the anger among the people he wasn't even involved with. He gets in the car. They all go for a ride. Mr. Polanco gets killed inside this apartment building, but the cooperators can't even agree as to whether my client's in the building. One of the cooperators says he's standing outside. Someone else says he held the door. Someone else says he was in the building. They can't even agree as to whether my client was there, but the one thing everybody agrees on is he played no role at all. Those factors have nothing to do with his age or his maturity, right? Those factors are present in many murders, right? Of course, Judge, and perhaps I'm mixing too many things together. There is, of course, the issue of mandatory punishment. What do we do about the Roper bright line, the idea that there has to be a cutoff at some point? What do we do with that language and that decision that kind of started this whole thing? Well, I think, Judge, that maybe the answer down the road is that there is no bright line. Maybe the answer down the road is that judges ought to be able to have the ability to determine in a case-by-case basis. So there shouldn't be any mandatory minimums on this basis? I think that there shouldn't be. Well, I'm sure you do, but I mean, is that the basis for us deciding this, that all mandatory minimums shouldn't exist because it doesn't take into consideration the individual characteristics of the defendant? Well, I think that the court can find its own balance in terms of deciding where . . . when the court can't . . . I mean, the candid answer for me is I think judges should have the ability. Judges are the people who have an individual standing in front of them. Judges are in the best position to understand what the full circumstances of a situation are. And for the judge to say, I'm sorry, my hands are tied, I think you did very little, but you got convicted. So spend the next seventy years in jail. To me, that seems . . . it ought to be unconstitutional. It ought to be unconstitutional to tie a judge's hands and say, you know all the facts, you've heard all the evidence, you've heard the witnesses, but you can't make any decisions. And I think it poses a real problem for the court. In these particular cases, we have young defendants, and so maybe the court gets to take into consideration . . . maybe the answer is that there should be hearings whenever there's a young defendant, and that hearing should determine whether or not there's scientific reason to think that that person is old enough to be sentenced to a mandatory minimum. Something that creates a framework within which the court can consider it. Your argument is solely that the Eighth Amendment bars it? My argument is that it should, yes. Eighth Amendment, not unreasonable. Eighth Amendment, right? The Eighth Amendment. Yes, Judge. And your argument is that the Eighth Amendment bars it also because there is, with respect to that particular offense, that aiding and abetting offense, there's no showing required of intent? That's correct, Judge. I mean, my client was convicted in both, all three murders, as an aider and abetter. And yet, as I said with the Polanco murder, can't even show what he aided and abetted. And in the other one, his brother begins to, or the co-defendant, begins to shoot as soon as the taxi cab door is open. My client's barely out of the car. There is a finding of intent on the charge of conspiracy to commit murder in aid of racketeering. There's no question, Your Honor, that my client was a member of the conspiracy. He had joined the conspiracy when he was 14 years old, and to hold him responsible. And in fact, there was evidence that he had moved away from the conspiracy. He hadn't attended meetings. He had joined a church, which was apparently a taboo. If you joined a church, you couldn't be in the conspiracy anymore. You couldn't be in the designated organization anymore. So there was evidence that suggested that he wasn't even a member anymore. Obviously, the jury rejected that. But it just seems to me that, I mean, maybe I have more confidence in our judges than the Congress does, but it seems to me that the judges are in a position to have all of the facts before them. Well, what about the statement by the district court in his sentencing, though, that he would have sentenced him to the life sentence anyway? I know he singled out Beltran to say, well, maybe I would have done something different without the mandatory minimum. But your client, he said, I would have given him mandatory life anyway, based on what I've heard at this trial. And I've had dreams about that for all these years. I think that the answer to that, Judge, is that Judge Engelmeyer, who's an incredibly thoughtful individual, didn't have an opportunity to hear anything about who my client was. He didn't get to know who my client was. He only got to hear what the cooperators had to say about him. But there's no realistic sentencing proceeding. Maybe a psychiatrist or psychologist could have testified as to the development of his brain and where he was. The kinds of things that the Supreme Court has said that the judges can look at when someone's 14, 15, 16, 17, and up to 18. This court will have before it, and I think some of my in the not so distant future, a case United States versus Cruz, which was recently decided in the Connecticut district by Judge Hall. And in that case, the defendant is 18 years old and 20 weeks. So do we draw the line at 18 weeks? And if you were born in August, you're in trouble. But if you're not in trouble, but if you're born in February, your life is over. It just seems to me that this is an opportunity for the court to really look at this issue and say, what makes sense here? We know so much more about science today than we did then, and how do we ignore it? You've reserved a couple of minutes for . . . Yes, I have, Judge. Thank you. We will hear you then. Thank you, Judge. Hi. Good morning, Your Honors. My name is Daniel Nooter. I represent Defendant Appellant Luis Beltran. In a moment, I'd like to get into the sufficiency of the evidence issues regarding 1959, but I'd like to just start by providing an answer on Mr. Beltran's behalf to a couple of questions that you asked, counsel, for my co-defendant. Regarding your question, Your Honor, about what about 50-year-olds, I would suggest that there are other lines of cases, Gant v. Arizona, for example, cases that really go to the question whether someone who is older maybe has enough mental incapacitation or brain damage or other issues severe enough to maybe raise other Eighth Amendment questions. I would suggest that maybe for defendants situated in those settings, there is another line that they can pursue. I'm not sure that that issue is implicated here as it might be. In response to the question about Roper and the bright line, I would suggest two things. One is that this Court and all Courts, the Supreme Court, has frequently dealt with a situation where there's a bright line that goes one way. Miranda is an obvious example, where if you don't have the Miranda warnings, then that's a bright line. But if you do have the Miranda warnings, you still have an opportunity to rebut the presumption that the statement made during custodial interrogation was not coerced. I think when you look at the language in Montgomery, the reason why we can't just take this bright line is because Montgomery says that this is not merely a procedural, but this is a substantive matter going to the core proportionality principle of the Eighth Amendment. On page 734 of citation 163, Supreme Court 734, the Court says, Miller then did more than require a sentencer to consider a juvenile offender's youth before imposing life without parole. It established that the penological justifications for life without parole collapse in light of the distinctive attributes of youth. So it's going fundamentally to the penological objectives, which are no longer sustainable when, and it's not that they become sustainable when you're a day or two older, 18, I would suggest. I think you need to have an opportunity to consider whether the proportionality principle is going to apply in an individual case. But turning to the 1959 issue, as I know there will be a lot more to be said on Miller and Montgomery, the specific intent element of 18 U.S.C. 1959 A1 requires the government to prove beyond a reasonable doubt that a defendant committed murder specifically to maintain or increase his standing within a racketeering enterprise. And this court has ruled that mere guesswork is not sufficient to establish that. So where do you draw the line between what's mere guesswork and what is a reasonable inference for a jury? And with this court, when you look at the cases, the cases cited in the briefs here, and there have been lots of cases on the matter, what all the cases that uphold the finding of the specific intent element have is some evidence, direct evidence involving the specific individual. Often that specific individual has been given orders by a superior, for example, to go out and murder someone. But your client was accompanied on this trip by four or five other people, several of whom were officers of this organization. Well, they were other members, that's true, of the organization. They were also his friends and associates. They were the people that he knew. I mean, there's no evidence that he, Mr. Beltran said, you know what, I really need to go out and find other members of the PTG so that they can accompany me. In fact, the uncontroverted evidence is that there was no green light. There's been so much that the government says about their testimony from someone who said he was supposed to get the green light, but he neglected to. Well, the testimony was a little bit back and forth on that. But what he said was he didn't. Well, to be honest, the testimony itself was a little bit contradictory. But that's the same witness who repeatedly said that this was just a personal matter and what he said, and I think I quoted in context. Can I ask you about that? This is Jose Cruz we're talking about. Yes. He said both things. He said at one point he said it was personal, and in other points he said it retribution by the gang. So isn't that enough? I mean, I've got the, do you believe the bad boys would look for retaliation? Yes, because we were attacked. He goes on to say more about the retaliation by the gang. Is the jury entitled to rely on that, or because it was contradicted by other testimony by him that it was personal, is that not something the jury could rely on? Yeah, that's a fair question, Your Honor. I would advise the court to look at the Bruno case, which is cited in the brief. And for the principle, the facts are quite different, but for the principle that this court has, while they obviously give and are required to give deference to the jury, are going to be willing to look beyond the jury decision to find out, is this actually a rational interpretation of the facts? And what was clear is that the Trinitarios were not attacked, and in fact this was the follow-up question. To follow up on Judge Jacob's question, what happened after the homicide, though? The Trinitarios, this particular group within that gang, funded his travel, got paid for his haircut, drove him around, tried to conceal his identity. Isn't that relevant as to whether it was part of the gang's work or solely personal? Well, I don't think so, Your Honor. And again, in this case, I would cite the farmer case, which both parties cited in their briefs, for the point that it's not what happens afterward, whether or not you in fact gain any benefit or not. And in fact, I think there was even a pointed sidebar in which AUSA Smith admitted that he had not in fact gained any formal increase in his standing. But what matters is your motive at the time that you committed the offense, not anything that may or may not happen later. And I would note, and I did not actually mention this in the brief, but if you look at the sentencing transcript, when the government is in fact describing to the district court what this crime was all about, there's no mention whatsoever of this key specific intent. And this is what AUSA Ortiz says. It's page 213, 214 of the appendix. I think it's maybe around 12 or 13 of the sentencing transcript. Mr. Beltran, after an altercation with Mr. Kasul, who is believed to be a member of the Bloods, felt disrespected after Raymond slapped him, and he sought revenge. He thought about how to get that revenge. He recruited his fellow gang members, including his brother. He meticulously loaded a gun and set out to find Raymond that night. When he did find him, he shot him, notwithstanding the fact that Raymond was with his own brother on that street corner and several other females who were with him that night, simply because Mr. Beltran felt disrespected. Simply because Mr. Beltran felt disrespected. Isn't that consistent with the idea that he did this because he felt disrespected and he knew that it was required of him as a member, if disrespected, to retaliate violently? I mean, the other side of that question would be, what would it do to his standing if he was punched in the face and he didn't do anything about it? And I think the best answer to that, Your Honor, is that when the court looks to what evidence is, what a fair inference is versus guesswork, they say, well, we need some evidence of that. So the evidence in most of these cases, for example, in the James case that the government cites, stands in part for the principle that you can have more than one motive. You can want personal revenge and you can also be doing this because it's required by the gang. But in that case, and I would say I think in all these other cases, there's also an order from the superior, in fact, informing the defendant, in fact, you have to do this on behalf of the gang. And there was an order from the superior in James. And here there's no order from the superior that gives the jury the evidence, the reasonable basis to find. And that's the difference between evidence and evidence-based inference versus just a guesswork. And I would suggest, Your Honor, that 1959 requires that there be an evidence-based inference rather than merely this sort of generalized in the air notion that the Trinitarios are going to generally want to respond or retaliate when they're disrespected. If you have no more questions for me at this point, I'll speak with you again. I have two minutes. We'll hear you then. Okay. Thank you, Your Honor. Good morning. May it please the Court. My name is Jesse Siegel with Irving Cohen. I represent Felix Lopez Cabrera. Mr. Lopez Cabrera is currently serving eight sentences of life without the possibility of parole for four terrible crimes he committed when he was 18, 19, and just eight days past his 20th birthday. As things currently stand, he will die in prison. We've raised two groups of issues. One group has to do are Damiah-related arguments. And with regard to those, I would simply like to point out that right now there's pending before the Supreme Court the case United States v. Davis out of the Fifth Circuit that is going to dispose of some of those issues. It will sort of address the issues underlying this Court's decision in U.S. v. Barrett. Unless the Court has any more questions on the Damiah issues, I'd like to turn to the sentencing issues. Go ahead. So I think clearly the Court is concerned with the issue of there being a bright line. Can I go back and just ask you about the 924C for one question? That is, in Barrett we held we could take a conduct-specific approach to applying the risk of violence clause, right? And that we concluded that even though the jury didn't make a finding on that, there was harmless error because there was so much evidence of violence. Isn't that the case here too, though? Can't we pursue that aspect of Barrett in this case because of the amount of violence that was before the jury? I know it wasn't objected to as a jury question, but that was the same approach taken by our panel in Barrett. Well, I think it's two separate questions. First of all, yes, if Barrett is controlling and if Barrett is not overturned by Davis before the Supreme Court, that'll dispose of our arguments here. But under the risk of force clause, I think the issue is different. And I think there— That's the one I'm focusing on, the risk of force. That came up in Barrett too, and we said that that could be a jury determination, the risk of force, that satisfies all the Supreme Court decisions. But it wasn't a jury issue in that case, the jury determined. We just said, well, but based on the evidence and the fact there was no objection to this, that the jury would have to have concluded it was the risk of violence to satisfy 924C. How is that different from here, is my question. Well, I think that there's a very narrow argument that's presented here. The underlying crime that is related to the 924C is intentional murder under New York penal law. And as we have argued, intentional murder under the New York penal law is not, in fact, does not qualify as a crime of violence because murder can be committed in New York by omission, which makes it a totally different analysis. But that's under the elements clause. It's not under the risk of force clause. That's true. You've raised that too. I'm not quarreling with you about that. I'm just saying under the risk of force clause, how do you get by a harmless error kind of analysis like we did in Barrett? Well, again, if Barrett controls, we don't. If Barrett is overturned by the Supreme Court in Davis, then we have to go then to the elements clause. Okay. Thank you. Okay. So to jump right in, this is the question of the bright line. And I think the way I would suggest looking at that is that one of the issues is where should the bright line be drawn if there should be a bright line? So the Supreme Court in Miller says there's bright line or there's that defendants who commit their crimes at younger than 18 can't be sentenced to life without parole mandatorily. In Montgomery, they take it forward a step and they say, well, not only is this a procedural question about whether or not it's mandatory, but in point of fact, Miller announced a substantive rule saying that people who and are younger than 18 can't be sentenced to life without parole, except if they are irreparably corrupt or permanently incorrigible. So the argument here specifically with regard to Mr. Lopez Cabrera is that he was 18, 19, and just barely past 20, that the same rule should apply to him, that he cannot be sentenced to life without parole without a finding that he is incorrigible. So... The 8th Amendment question is the same whether a judge on his own or her own picks the sentence of life without parole or whether the Congress requires it. Is it the same 8th Amendment question or are they different? I think it's the same argument. And so Judge Hall in the Cruz case out of the District of Connecticut was dealing with the exact same issue. She looked at the question of whether a defendant who committed his crime when he was 18 years and 20 weeks, whether Miller should be extended to him. And she found that it could be that the bright line or the supposed bright line established by Miller was not quite so bright. That Miller in finding that a defendant who was younger than 18 years old could not face mandatory life imprisonment didn't mean that it was constitutional, therefore, to sentence everybody over the age of 18. It was, again, I think as my colleague has described, that it was a line that went one way and not the other. And that's pretty much what Judge Hall did with that question in her decision. And as a matter of fact, what she said is that there are different types of bright lines. And she looked at some of the Supreme Court's jurisprudence regarding imposition of the death penalty. And she noted that in the Thompson case, the Supreme Court had said that death penalty was unconstitutional for people under the age of 16. Then in the Stanford case, the Supreme Court found that the death penalty was not unconstitutional for people between the ages of 16 and 18. Then that was followed up very quickly by the Roper case when the Supreme Court said, no, we're disagreeing with that. The death penalty is unconstitutional for anyone under the age of 18. But that in the Roper case, the Supreme Court felt it was stated that it was overturning Stanford, which had specifically addressed the question of people between the ages of 16 and 18, but didn't say that it was overturning Thompson. Indicating, again, that the Thompson line had not implied that the death penalty was okay for people over the age of 16. It simply said that for people younger than 16, it was not okay. What's the significance of a Reinhold decision? I have to confess, Judge, I don't know the answer to that question. Unless there's anything further. You'll have a rebuttal. Thank you. We'll hear the government. Good morning. Good morning. May it please the Court. My name is Matthew LaRoche. I represent the government on this appeal, and I represented the government in some of the proceedings below. I'm going to start where Mr. Siegel left off, which is on the Miller argument, and specifically a case that hasn't been mentioned yet, which is Harmelin, the Supreme Court's decision in Harmelin. That case stands for the proposition that mandatory minimum sentences of life in prison are constitutional. Miller did not change that at all. All Miller said was that under the age of 18, there is a bright line that any individual below that age cannot be subject to the mandatory minimum of life imprisonment. And the reason why that is significant is because in Miller, the Court specifically said they are not overturning Harmelin. In those circumstances, the resolution of the Miller issue is straightforward. Harmelin remains good law, and individuals 18 or older can be subject to a mandatory minimum sentence of life imprisonment. Now, this is also definitively not the case in which the Court should consider reevaluating Miller and applying it to individuals who are over the age of 17. The reason for that is threefold. One is that Judge Engelmeyer has already said that at least with respect to Lopez and Lopez-Gabrera, that a reasonable sentence and the sentence he would have imposed would have been life imprisonment regardless of the mandatory minimum. And in fact, with respect to Lopez-Gabrera, he said it was the only reasonable sentence for Lopez-Gabrera. Second, it is not, this case is not like the Cruz case which was cited in the 28J letter of defense counsel. If the Court is considering something on a mandatory basis, then the Court is not going to consider or even entertain evidence that would justify a lesser sentence. So to say, I would do it anyway, I would impose the same sentence even if I heard evidence that I haven't heard, it doesn't make a great deal of sense. Your Honor, I think Judge Engelmeyer did look at the 23A factors and did make an effort to determine, regardless of the mandatory minimum, what the sentence would have been. And I think the sentencing transcript plays that out. But there are additional reasons why I think in this case in particular, reevaluating Miller and Harmelin, despite being, we believe, just contrary to direct Supreme Court precedent, this would not be the case to do it. In addition to what Judge Engelmeyer said, look at the ages of these individuals at the time of the murders. So Beltran was 21 years old at the time of the fourth murder that Lopez Cabrera committed. He was 20 years old. And at the time of the third murder that Lopez committed, he was 22 years old. So this is significantly different than the circumstance presented in the Cruz case where the individual was 18 years and I believe several weeks old. And the last reason that this shouldn't be a case to reevaluate Miller in terms of individuals 18 or older is because Miller was dealing with two 14-year-olds and was citing circumstances in their youth in terms of their ability to be influenced and not understanding the consequences of what they did, which are simply not the case here. These are not isolated incidents. These individuals were founding members of the bad boy gang and over a period of years engaged in numerous acts of violence, not just these four murders, but numerous other shootings, stabbings, and assaults, which suggests that these are not the types of individuals who were at play in the Miller case, two 14-year-olds. Mr. Beltran, though, he had criminal history category one and no prior convictions in the PSR. He didn't, Your Honor. But again, if you look at his conduct, Your Honor, what was proven at trial, it was not just simply this murder. He was involved in other shootings. He was involved in an incident with Mr. Lopez where he chased a blood with a gun. There were numerous other incidences involving very violent activity with Mr. Beltran, which suggests that he was a very violent individual who wasn't someone like the individuals in Miller. But again, because they're- The court also said, I pause at Mr. Beltran, though, on the mandatory life. I might not have given this to him, right? He heard all the evidence you just told me about at trial about part from his criminal history before this case about the other incidents involving Mr. Beltran. But the district court even said, you know, this is the one defendant of the three here that I might not have given a life sentence to. How do we deal with that? That's correct, Your Honor. And then you're back to what is the law based on Supreme Court precedent. And the law is very specific and clear, which is that mandatory minimum sentences for individuals 18 years or older are constitutional under the Eighth Amendment. Now, as a policy matter, maybe the legislator should evaluate whether that should in fact be the case, but that's not the question for the court. The question for the court is whether under the Eighth Amendment, whether the Eighth Amendment requires more. It doesn't. It just simply doesn't based on clear Supreme Court precedent in Harmland, which is reaffirmed in Miller, which explicitly says we're not overruling Miller. With respect to the sufficiency challenge for Mr. Beltran, I'd submit If we go back to the sentencing for a moment, am I correct that all of the all of the offenses for which Mr. Lopez was sentenced to a mandatory life without parole were aiding and abetting? Yes, Your Honor. He was not the shooter. What I would say is just Edmund would seem to suggest that that that that's at least dubious because, you know, there's there's no death penalty without if for an offense that's purely aiding and abetting. But the distinction between death sentence and life without parole is eroding before our eyes. Understood, Your Honor. And I think that that is why in Miller the court said they were applying that line of precedent that death is different to individuals below 18. And they said that there was a line of precedent saying when it is you're that young, the reason they're extending that death penalty jurisprudence is because if you are someone who is 17 or 16 or 14 and you get the life sentence, that is essentially a death sentence. That was the reasoning in Miller. Now, again, the question, though, is whether Miller opened the door to people 18 and above. And they simply did not because in Roper, the court set the age at 18. And of course, there are going to be circumstances where that is over inclusive or maybe under inclusive. But that is the rule. That is the line. And the question is whether that is constitutional under the Eighth Amendment. And Harmelin makes clear the mandatory minimum sentences of life imprisonment are. With respect to the sufficiency challenge, I'd submit that the evidence here is overwhelming. And I point to the court's other decisions addressing sufficiency challenges for murder and aid of racketeering, particularly Concepcion, Farmer, and Witten. Those three cases, I think there are common strains in those cases about what the court saw with respect to the evidence. And that is, did the enterprise have any rules or norms with respect to retaliation or whether engaging in acts of violence would raise someone's status? Second, prior to the killing, did individuals in the enterprise know about it? Were they involved in it? And third, after the killing, did the individual who committed the killing brag about it or talk about it to other members of the enterprise? Here, you have all of those things and more. There was significant testimony that the rules and norms of the Trinitarios gang was that if you were attacked by a rival, you seek vengeance, you retaliate. There was significant evidence that engaging in acts of violence as a Trinitario would boost your reputation. It is a way for a Trinitario to make a name for himself. Now, if you look at specifically what happened with respect to Raymond Kasul and Mr. Beltran, he was attacked by an individual he understood to be a blood. He decided to seek retaliation for that. And he didn't do that on his own. He went back to the Trinitarios, to the leaders of the bad boys. Mr. Cruz, one of the cooperators, was the leader of the bad boy set. He was involved in the murder. Mr. Lopez Cabrera was the leader of another bad boy set. He was involved in the murder. And during that planning process, Mr. Cruz asked Mr. Beltran, what are you doing? Mr. Beltran responded, what do you think? He knew what he was doing because he got attacked by blood. He decided to retaliate. After the murder, there is additional evidence that, as Judge Droney referenced, that the gang helped protect him. They funded his escape. They helped him hide out. And there was also evidence that Mr. Beltran admitted to another cooperating witness, Mr. Balonia, that he killed the blood so the blood wouldn't be able to put his hands on anyone else. All of those circumstances together are more than sufficient evidence for a rational trier of fact to infer that he was doing what was expected of him, as Judge Jacobs asked the question. That was expected. What about Cruz's testimony that's contradictory, though, that was purely personal? How do we deal with that? Understood, Your Honor. And I think the question you asked was the right one, was that the jury got all of that evidence, and there was significant arguments about how to interpret that evidence. The government made numerous arguments that, on redirect, Cruz explained exactly what he meant, which was that, although he was attacked personally, that the rules and norms would be that you retaliate, and that's exactly what happened. The jury was capable and entitled to take that evidence and accept it or reject it. And you said it had nothing to do with the Trinitarios. Yes. And that's true. Is that right? It had nothing to do with the Trinitarios. Exactly. That's pretty contradictory. On cross-examination, I'd agree, Your Honor. That is obviously not the best testimony for the government. But I think the redirect there is where the government specifically asked, what did you mean by it being personal? And what he said was he was attacked first. He then went through, why would he understand that the bad boys would retaliate? And that's because the bad boys were disrespected. Now, again, we make this point in our brief. Even if the jury completely accepted that testimony, there was significant other testimony in the record to show that this was in retaliation for Bloods attacking him. And it can also be the case that it can be personal and also still be in aid of racketeering. So the fact that someone else other than Beltran might have thought it was personal doesn't necessarily mean that it's not a murder in aid of racketeering. Unless there are any additional questions, the government rests on its mission. Thank you. Thank you. Ms. Kelman. Thank you, Your Honor. Your Honor, I suppose that one of the things that I would propose the court to consider would be the notion that, given the way that brain science is evolving and advancing as quickly as it is, that perhaps the bright line that was once 14 or 15 or some definition has to change and has to be defined by conduct and by one's actions and not by one's age. If you shoot someone, then there's a bright line. But in this particular case, the district court judge has no ability to consider the fact that my client wasn't the shooter, his age notwithstanding, he wasn't the shooter. He didn't plan any of these murders. He wasn't present at the time of one of the murders. And even his presence in the double homicide, which began to occur the minute a taxi door opened and somebody started firing, it wasn't my client. The court doesn't have the ability to take into consideration, again, separate and apart from age, the fact that somebody who doesn't go someplace with the intent to kill and doesn't participate in the killing is also subject to... What do we do with what seems to be the fact that no intent was shown with respect to the offenses for which your client was sentenced to life without parole, but that intent was necessarily shown with respect to another offense of which he was convicted? And that was murder in aid of racketeering or conspiracy to commit murder in aid of racketeering. Right. I understood, Judge. I think that, again, his role in that shooting, again, is something that I think the court could take into consideration as whether or not it warrants a mandatory sentence, but the court can't take that into consideration, obviously, when there's a mandatory sentence. And I think that the notion of taking away from the court the ability to judge all of the circumstances, I just want to, if I can impose and speak to Judge Joni's point about Judge Engelmeyer, because that statement by the court, who I respect tremendously, has bothered me since the day he said it. And I'd like to think that if I had the opportunity to advocate and he had the opportunity to do something differently, that I might have been able to change that position. But obviously, you approach a sentencing as a defense lawyer, you approach a sentencing very differently if you know that the outcome, you can't affect the bringing in psychologists or mitigation experts or people who could educate the judge as to who the individual before him is before a sentence is imposed. So I submit that given the science that the court think about being in the Second Circuit, if any circuit can do it, it's the Second Circuit, and that is try to create a bright line that is separate and apart from a numerical concept. Thank you. Thank you. No, we have a question. If we thought the aiding and abetting had constitutional significance, are you saying that it would go back to the judge to decide that he could then give a life sentence, but he would do it without the force of the congressional mandate? Yes, Your Honor. But he could give a life sentence? Yes, Your Honor. Without parole? I think any time a judge has the discretion and has the ability to consider all individual circumstances, that is what we aim for, all of us, the ability for the court to impose a fair sentence. I would just ask the court again to look at Edmund, which is cited in my brief. It is a case where the Supreme Court made the distinction where somebody was an aider and abetter. Thank you. Thank you, Judge. Mr. Nutter. Thank you again, Your Honor. I just want to Jose Cruz, it's true, has the most powerful statement of repeatedly saying that the murder had nothing to do with the Trinitarios, but it's not just Cruz. It's Cruz, it's Bayania, it's Jose Marmolejos, it's Wendy Tavares, it's even ultimately, as I read earlier, the government's own summary of the offense it's sentencing. It's not just one thing that we're asking the jury to overlook. It's an entire set of facts saying that this was a personal rather than Trinitarios matter. And this matters, and this really dovetails with the other issue, because whether or not this specific intent element exists or not makes the difference between whether or not someone is going to have a mandatory life sentence, at least under the current law, or not. It makes the difference as to whether there's even federal jurisdiction over this matter, because it's the tethering to RICO that provides the subject matter jurisdiction. So this isn't just sort of an ancillary matter to the question. It's the key question. The Vicar Act itself is violent crimes in aid of racketeering. It needs to be an aid of the racketeering. And this sort of general sense, and so the government said, look at Concepcion. Concepcion says it needs to be an integral aspect of membership in such enterprises, and the government... It wasn't unanimous to these other witnesses. Gonzalez said that it boosted his reputation in the gang, right? It wasn't just Cruz's testimony. There was conflicting evidence both ways. Well, there was some, but the beneficial evidence to the government is all this sort of post hoc stuff, and the post hoc ergo proctor hoc argument is exactly what in saying you can't look at what happened afterward and what the actual effect is. You need to look at what... You need to look at it at the moment that the crime is being committed. And so I would suggest that while there was that other evidence, it's not relevant to the correct legal question as Farmer sets out. The government says, look at the Witten case, but the Witten case was another case where there was a direct order from a superior to the defendant to go out and kill the other gang member. And the government doesn't tell you to look at the Thai case, but I ask you to look at the Thai case because that's a case where there was the same notion of animus against another group. They're against Asians. Here it's against the Bloods. And the court says, look, to just find essentially the no more that because this happened to be a very violent crime, it was that we can infer that this is going to advance the enterprise is guesswork. That was the case where this guesswork language comes from. It was guesswork in Thai to say, well, they're Asians, and we know we have this animus against Asians. And I offer your honor that the government is doing little if anything more in this case by saying, well, look, Kasool was a Blood, Beltran was a Trinitario, and that's enough for you to find under these sort of generalized norms about not wanting to be disrespected. Wasn't the underlying dispute about territory? Well, I think the underlying dispute was that my client was assaulted and punched in the face by Raymond Kasool that day. There's a reason they were both there. Wasn't it because there was a territorial rivalry? The murder happens that same day because of this assault. There were days and days and days in which murders did not happen. It happens on this day The government brings up the case of Harmelin. Harmelin's a 1991 case, which is 14 years before Roper. It is 21 years before Miller and something more than that before Montgomery. The Supreme Court has not yet had the occasion to revisit it in light of its decisions in Miller and Montgomery. Are we bound by it? If not, why not? I don't think you are bound by it just as Judge Hall was not bound by it in the Cruz case because it's at least implicitly overruled or certainly inconsistent with the logic in Miller and the neuroscience that underlies those cases, which I think is another thing the government doesn't mention at all. They don't disagree with the neuroscience that shows that the development of the adolescent brain continues into the mid-20s. They simply are reduced to arguing in favor of a bright line rule. In fact, in the Cruz case, once again, which is being appealed, I don't think it has been briefed yet, but it is being appealed by the government. In the Cruz case, the court took testimony from Dr. Lawrence Steinberg. Dr. Lawrence Steinberg is one of the foremost experts on neuroscience and the development of the in Roper and also in Miller. He explained, as described in the Cruz decision, that at the time Roper was decided, which was 2005, there had been very little research into the development of the adolescent brain beyond the age of 18. Really, that type of research didn't start to gather steam and accumulate until around 2009 or 2010, and that it's really been since that point that there's been an accumulation of research as to how the brain develops past 18. Particularly, he describes late adolescence as being from 18 to 21. He's asked for some conclusions, and he says he has absolutely no doubt that what he had written about the brains of people younger than 18 that was relied upon in Roper would equally apply now to people during what he calls this late adolescent period. Thank you. Thank you all. We will reserve decision.